UNITED STATES of America,
Plaintiff–Appellee,

v.

Eduardo RAMIREZ,
Defendant–Appellant.

No. 88–1319.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 11, 1989.

Decided July 24, 1989.

Douglas B. Cone, Merced, Cal., for defendant-appellant.

Donald W. Searles, Asst. U.S. Atty., Fresno, Cal., for plaintiff-appellee.

Before WALLACE and NOONAN, Circuit Judges, and ZILLY, District Judge *.

NOONAN, Circuit Judge:

Eduardo Ramirez was convicted by a jury of conspiracy to distribute cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(1), of possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1), and of possession with intent to distribute heroin in violation of 21 U.S.C. § 841(a)(1). He appeals. We reverse his conviction on the ground that there was insufficient evidence to sustain it.

### FACTS

On June 1, 1987 a combination of federal and local law enforcement officers conducting an undercover operation purchased an ounce of cocaine from one Miguel Valdez in a parking lot in the rural town of Carruth-

* The Honorable Thomas Zilly, United States District Judge for the Western District of Washington, sitting by designation.

ers, Fresno County, California. After the transaction Valdez was observed going to a house at 11798 South Elm Avenue, Carruthers. On June 9 the undercover agents purchased six more ounces for $5,700 in the same parking lot. Valdez was accompanied by a man named Armando who said the cocaine came from the same place. Both before and after the deal Valdez was seen at the house at 11798 South Elm. On June 12, 1987 the agents met Valdez in the parking lot and purchased a kilo of 100 percent pure cocaine in the form of a brick. At approximately 1:30 p.m., following the completion of the sale, Valdez was arrested.

Simultaneously, law enforcement officers with a search warrant entered the Elm Street house. First announcing their presence and asking to be admitted, the officers after no more than 30 seconds broke into the house. Detective Havlik saw the defendant, Eduardo Ramirez, emerge from what was later identified as the master bathroom. Havlik had his gun drawn and ordered Ramirez to lie on the floor. He did so with his hands out-stretched and made no physical move in disobedience to Havlik's command.

A search of the bathroom by the officers disclosed in plain sight a triple-beam scale; a shoe box with its cover on; one plastic bag; and a bar of soap and a towel. Ramirez was wearing only men's shorts. A search of his pockets reviewed a rolled $20 bill with traces of cocaine; a single razor blade; some plastic bags; and a set of keys. In a drawer under the bathroom counter were plastic bags, tape, scissors, a knife, and a jar wrapped in black electrical tape containing seven ounces of 50 percent pure heroin. In the wastebasket of the bathroom was a brown wrapper in the shape similar to the kilo of cocaine Valdez had delivered. When the shoe box in the bathroom was opened, it was found to contain cocaine.

The master bedroom adjoining the master bathroom contained furniture in a feminine style and both male and female clothes. Folded under a quilt on the bed and not in plain sight, was a substantial amount of United States currency. Underneath a night stand was a sock containing more cash. Under the bed was a loaded pistol, later identified as owned by Ezekiel Lopez. There was also a ledger hidden under the bedspread. In a baby crib located in the corner of the room was a package found to contain a kilo of cocaine. On the night stand in the room was the inner liner for a baby bottle, found to contain cocaine.

In the smaller, west bedroom of the house there was found a pile of male clothing. In the bottom drawer of a dresser in this room was an envelope dated May 9, 1987 addressed to Eduardo Ramirez at an address in Riverside, California and two class yearbooks whose connection, if any, with Ramirez has not been stated. In the top drawer of this room was a notebook containing ledger entries stating the record of drug sales.

The house was on a single level, containing in all three bedrooms and two bathrooms. Ramirez's mother, Rebecca Moreno, and her husband, Ezekiel Lopez, lived there with an infant child seven months old. According to Rebecca Moreno they had been in the house 20 days. Rebecca Moreno, who was tried with Eduardo Ramirez, was found guilty of the same charges as her son.

At the time of the officers' entry Rebecca Moreno was not present, having, according to her testimony, left at about 9:30 a.m. to attend a Tupperware party. Those present at the time of the search of the South Elm Street house were 22 year-old Eduardo; his 20 year-old brother Heriberto; and his 16 year-old sister, Maria. Maria had graduated the day before from Riverside High and the boys had attended the graduation and a party that went on into the morning hours of June 12. At the time of the entry of the officers Maria was using the shower in the bathroom adjoining her room. Heriberto was watching television in the living room.

Both Maria and Heriberto testified as defense witnesses; Rebecca testified in her own defense; and Eduardo did not testify. According to Heriberto and Rebecca, Eduardo slept on the bed in Maria's room.

Maria did not testify to this fact. According to Maria, Eduardo was at the time regularly living at his girlfriend's house, but had only returned to the South Elm Street house late the night before after the graduation party. The girlfriend also testified that Ramirez was normally residing with her.

At the close of the government's case, Ramirez moved for judgment of acquittal. The motion was denied. Ramirez did not renew the motion at the close of all the evidence. He appeals, contending that the jury's verdict was plain error.

## ANALYSIS

 1. *Standard of Review.* Ramirez waived his objection to the sufficiency of the government's evidence by not renewing the motion of acquittal. *United States v. Comerford*, 857 F.2d 1323, 1324 (9th Cir.1988). Nonetheless, "plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Fed.R.Crim. P. 52(b). If such error has been committed, this court has the power and duty to prevent a miscarriage of justice. *Marshall v. United States*, 409 F.2d 925, 927 (9th Cir.1969). We review, of course, the evidence in the light most favorable to the government.

2. *The Evidence against Ramirez.* Viewed in this light, the evidence shows that Ramirez possessed a $20 bill which could have been used as a straw for cocaine and a razor blade that could have been used to cut cocaine. Neither of these facts shows that he possessed cocaine or heroin with an intent to distribute or that he had made an agreement to distribute cocaine.

There was no evidence connecting the drug ledgers with him. The government, indeed, made no effort to show by handwriting or by fingerprints that he had any connection with the ledgers. The mere existence of one ledger in a room where there was a letter with Ramirez's name on it did not show the ledger to be his. Even if the jury did not believe the testimony that Ramirez normally stayed at another house

and found that Ramirez normally slept in the west bedroom, the government produced no evidence from which a jury could have concluded that either ledger was Ramirez's or even known to him. The government failed to show that Ramirez kept any personal articles of clothing in the drawers of the west bedroom.

The one evidence of drug trafficking that Ramirez could not have missed, according to the government's witnesses, was the scales that could have been used to measure cocaine. But it is a great leap to conclude that a son who knows that there are such scales in the bathroom used by his mother and step-father has therefore possessed cocaine or heroin with intent to distribute or has agreed to distribute cocaine. Nothing established that Ramirez knew of the money, drugs, or weapon in the master bedroom.

The government contends that the defendant "was discovered in extremely incriminating surroundings." But there is nothing incriminating in the drugs and money found in the house unless the defendant is shown to have been aware of them. This, the government failed to show.

The government witnesses say that Ramirez did not appear to have showered when he was apprehended leaving the bathroom, nor did they hear the toilet flush. The government urges us to infer from these negatives that Ramirez was doing something with the cocaine in the bathroom; but they provide no theory from which we could infer that he knew that the cocaine was there or that he was hiding it.

 To bring together all of the evidence against Ramirez to see if convergently and cumulatively it could sustain the guilty verdict: he was a cocaine user left in a house where a large amount of cocaine and a large amount of cash were easily accessible although not in plain view; he had probably spent the night in a bedroom that contained in a drawer a ledger of drug transactions; he was apprehended while emerging from the bathroom that contained both cocaine and heroin and materials used in drug distribution. All of these facts, even

collectively considered, establish beyond a reasonable doubt neither possession of the drugs nor intent to distribute them nor agreement to distribute. Handwriting and fingerprint evidence against Ramirez are lacking. He has not been observed by any witness selling a drug, agreeing to sell a drug, or acting as a courier or watchman for a drug dealer. Circumstantial evidence can convict, but not circumstances which demonstrate neither participation nor guilty knowledge and cooperation.

To hold that on such very flimsy evidence a person may be found to have committed three serious federal felonies would be to put our approval upon a manifest miscarriage of justice.

REVERSED.